580 A.2d 832

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Randall PROBST, Appellant.**

Superior Court of Pennsylvania.

Submitted June 11, 1990.

Filed Sept. 18, 1990.

46

William J. Miele, Williamsport, for appellant.

Brett O. Feese, Dist. Atty., Williamsport, for Com.

Before CAVANAUGH, BECK and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from a judgment of sentence entered in the Court of Common Pleas of Lycoming County. We affirm.

The record indicates that on March 27, 1988, the appellant, Randall Probst, Sr. contacted a local "helpline" to report the stabbing of his live-in girlfriend, Nicole Deemer. The helpline notified the police of the incident. Soon thereafter, the paramedics arrived at Probst and Deemer's apartment where they discovered the victim, Deemer. She was nude and had multiple cuts on her back, buttocks, thigh and face. Additionally, Elavil pills were found near her body. Deemer had lost between forty to fifty percent of her blood. As a result, her body temperature had lowered to approximately eighty five degrees.[1]

1. A more detailed recitation of the facts, as gleaned from the trial transcripts in the instant case, may be helpful. The notes of testimony reveal that on March 26, 1988, Probst and Deemer began arguing while at the Linwood Inn. N.T., testimony of Nicole Deemer, June 12–14, 1989, at 103–04. Probst, while in a jealous rage, accused Deemer of having sexual relations with other men. *Id.* He threatened to kill her if his beliefs were ever confirmed. *Id.* at 104–05. At some point during the evening, Probst and Deemer returned to their apartment where they reconciled. Then, they drove to the K–Bar where they remained until one o'clock a.m. Next, they went to Morey's Bar but only stayed there briefly before returning to the K–Bar. They continued to drink at the K–Bar until four o'clock a.m. Both Probst and Deemer were intoxicated when they left the bar to return home. Deemer testified that after Probst drove home from the bar he became violent and began kicking her up the steps of their

The police questioned Probst following the incident. The interrogation was videotaped. Officer David Bailey, Lt. Phillip Preziosi and Agent William Dalton of the Williams-port Police Department were present. Lt. Preziosi read Probst the Miranda warnings and asked him if he understood his rights.[2] Probst responded affirmatively, proceed-

apartment. Deemer also stated that Probst threw her down the steps. *Id.* at 109–10. Deemer passed out and does not recall any subsequent events. Probst contends that Deemer's injuries may have been the result of his ex-girlfriend's attempts to have Deemer killed. N.T., Testimony of Randall Probst, Sr., June 14–16, 1989, at 185, 189–93.

2. The following excerpts from Probst's videotaped confession are pertinent to the instant discussion.

Lt. P.: OK, Now, Randy, I'll reintroduce myself. I'm Lt. Phillip Preziosi, Williamsport Bureau of Police. This is Agent William Dalton, also of the Williamsport Bureau of Police and the officer back there is Officer David Bailey, who is a uniform Officer of the Williamsport Bureau of Police. Randy, what we're going to be doing is talking with you in regard to some events this evening but before we talk with anybody about anything we always advise them of what we refer to as the Miranda Warning, just ta [sic] explain to you what your rights are, OK?

R.P.: Yes, Sir.

Lt. P.: So, ah I will explain it to you and then Agent Dalton will let you read it and sign it if you wish and we'll (inaudible). Alright, if you listen very carefully. . . . I wish to advise you that you have an absolute right to remain silent, that anything that you say can and will be used against you in a court of law. You have a right to talk to an attorney and have an attorney with you during questioning if you so desire. If you can not afford to hire an attorney, one would be appointed to represent you before any questions and if you decided that you wanted to answer any questions you can stop at any time that you wish. Do you understand that, Randy?

R.P.: (Inaudible) Yes.

Lt. P.: Do you know what an attorney is?

R.P.: Yes.

Lt. P.: Would you explain to me what your (inaudible) of an attorney is.

R.P.: A guy that, that ah, ah, ah protects you when you're, when you got problems.

Lt. P.: Somebody to advise you of your . . .

R.P.: Right, right, right.

[. . . .] Lt. P.: OK, well, you understand what I explained to you right now?

R.P.: Yes, sir.

Lt. P.: OK. And, you're willing to talk to us about that without having an attorney?

R.P.: . . . . anything that I can help ya out with, I mean, anything that will, that will help clear my head too about this, ya know.

ed to sign a waiver and volunteered information to the police. *See* Randall Probst, Videotaped Interview, March 28, 1988, at 1–47.

During his interview with the police, Probst detailed his relationship with Deemer, his medical problems, his contemplation of suicide, their drinking problems, Deemer's past roommate, his children, his ex-girlfriends and the fact that he does the housekeeping and cleaning. Notably, Probst did not confess to committing the stabbing. *See* Probst's Videotaped Interview, March 28, 1988, at 1–47. At one point during the interrogation, Probst stated that he "probably" was responsible for Deemer's injuries. *Id.* at 11–12. However, even this purported admission was not a definitive declaration of guilt. Probst confined any comment relative to his participation in the stabbing to the following statement: " ... I just, I'd like you guys to know that alright I probably did it because I have a hurt hand." *Id.* at 12.[3]

Following a jury trial, Probst was found guilty of aggravated assault and reckless endangerment.[4] Post-verdict motions were denied. Thereafter, Probst was sentenced to eight to sixteen years imprisonment. This appeal followed.

On appeal, Probst raises three issues for our review. First, he claims that his videotaped statement should have

[....] [Probst reads his Miranda rights aloud to Lt. Preziosi. He indicates that he does not know if he wants an attorney. Immediately thereafter, the following transpires].
Lt. P.: OK, you understand that if any time that you tell me that you don't want to talk anymore, you could stop. You understand that?
R.P.: Yes.
Lt. P.: OK.
R.P. (reading) By affixing your signature on this waiver you are acknowledging that you have read and understand the rights that are explained on this form. I understand this.
Lt. P.: OK, if you would please ...
R.P.: Sign here?
Lt. P.: Yes, Sir.
R.P.: OK.
Randall Probst, Videotaped Interview, March 28, 1988, at 1–3.

3. *See also* N.T., June 12–14, 1989, at 14–15, 26 (Probst made similar statements to the police at the scene of the crime).

4. Probst was acquitted of attempted homicide.

been suppressed because he did not knowingly, voluntarily and intelligently waive his Fifth Amendment Rights. Second, he asserts that the Commonwealth's expert witness should not have been allowed to testify, in response to a hypothetical question, about the cooling rate for a deceased body. Third, he argues that the trial court erred in permitting testimony from the victim and other witnesses that Probst previously attempted to force the victim to swallow the drug Elavil.

Probst first asserts that the trial court erred in denying his motion to suppress his videotaped statement. Our standard of review in considering an appeal from the denial of a motion to suppress is well established. Our role "is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Fromal*, 392 Pa.Super. 100, 111, 572 A.2d 711, 717 (1990); *Commonwealth v. Reddix*, 355 Pa.Super. 514, 518, 513 A.2d 1041, 1042 (1986). In making this determination,

> we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. (Citation omitted). Moreover, when the evidence viewed in this manner supports the factual finding of the suppression court this Honorable Court can reverse only if there is an error in the legal conclusion drawn from those factual findings.

*Reddix*, 355 Pa.Super. at 518, 513 A.2d at 1042; *Commonwealth v. Cauto*, 369 Pa.Super. 381, 535 A.2d 602 (1987) (this Court may reverse the suppression court only if its legal conclusions, drawn from the facts in the record, are erroneous).

Here, Probst alleges that he did not waive his right to counsel during his custodial interrogation. He asserts that he was the victim of psychological coercion and that he did not possess the requisite mental capacity "to know what he was saying and to have voluntarily intended to say it."

(Appellant's brief, at 9–10). *See Commonwealth v. Harm,* 272 Pa.Super. 431, 416 A.2d 533 (1979); *cf. Commonwealth v. Smith,* 470 Pa. 220, 368 A.2d 272 (1977). In support of his position, Probst relies on the testimony of Dr. Steven A. Raggusea. Dr. Raggusea stated at the suppression hearing that he did not think that Probst was capable of making "an intelligent, voluntary, informed, knowing consent or waiver." N.T., June 12–14, 1989, at 78.[5]

On appeal, Probst argues that he was unable to comprehend his rights. Therefore, his waiver was invalid. After a thorough review of the record, we disagree.

The trial court briefly summarized the evidence in the instant case. In its opinion, it stated:

[Probst claims] that the Court erred by denying to suppress the video tape because of the Defendant's failure to knowingly, intelligently, and voluntarily waive his Miranda rights, and because the Defendant never explicitly nor clearly waived his rights. The evidence in question related to a video taped interrogation by Lt. Preziosi and police officers Dalton and Bailey. Denial of the motion to suppress was based on the Defendant's continual waivers of his Miranda rights as recorded on the videotape. In addition, the Defendant never affirmatively invoked his right to counsel. See, *Commonwealth v. Hubble,* [509 Pa. 497], 504 A.2d 168 (Pa.1986). Before beginning to question the Defendant, Lt. Preziosi advised the Defendant of his Miranda rights and proceeded to assure that

5. We note that the trial court rejected Dr. Raggusea's testimony. N.T., June 12–14, 1989, at 90–92. The fact-finder is deemed to be in the best position to assess the credibility of a witness and to weigh the evidence. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984); *see also Commonwealth v. Parker,* 387 Pa.Super. 415, 422, 564 A.2d 246, 248 (1989) (an appellate court will not engage in a reevaluation of a witness' testimony found credible by the finder of fact). In the instant case, the trial court listened to Dr. Raggusea's testimony. The trial court was free to believe all, part of none of his testimony. *Commonwealth v. Jensch,* 322 Pa.Super. 304, 315, 469 A.2d 632, 638 (1983). We will not disturb the trial court's ruling where it is substantiated by the evidence. *See Commonwealth v. Reddix,* 355 Pa.Super. 514, 518, 513 A.2d 1041, 1042 (1986) (discussing our standard of review with reference to the denial of a motion to suppress).

the Defendant understood his rights. The Defendant also was asked to read the Miranda statement aloud and proceeded to do so. The Defendant stated on several occasions that he understood what the officers had explained to him. Further into the questioning, the Defendant demonstrated that he was aware of his right to counsel when he stated, in an "aside", that he was not sure he should speak without an attorney present. The Defendant then waived his rights by speaking, without the prodding of the police. Later into the video testimony, the Defendant spoke to the police and said that "no lawyer can tell me to shur [sic] up about this kinda stuff cause I wanta volunteer this stuff." The Defendant came close to asserting his rights to an attorney near the end of the video testimony, stating that "maybe I should call a lawyer," but testimony from the video tape made after this statement is not at issue. We conclude that the Defendant's Suppression Motion was properly denied in this Court's June 12, 1989 Order, and accordingly the Post Trial Motion on this issue is denied.

Trial Court opinion, at 2–3. We find that the trial court's findings are amply supported by the record.

In *Commonwealth v. Carter*, 377 Pa.Super. 93, 546 A.2d 1173 (1988), this Court set forth the test for determining whether a statement was rendered voluntarily. We stated:

In determining whether a confession, obtained as a result of custodial interrogation, is admissible, the accused's *Miranda* rights must have been explained to him and he must have knowingly, voluntarily and intelligently waived these rights. Further, the Commonwealth must show by a preponderance of the evidence that the confession was voluntary. The test for determining whether the confession was voluntary and the waiver of the *Miranda* rights was valid is a totality of the circumstances. Factors which must be looked to in reaching this determination include the following: the duration and methods of interrogation, the conditions of detention, the manifest attitude of the police toward the accused, the accused's

physical and psychological state, and any other conditions which 'may serve to drain one's powers of resistance to suggestion and undermine his self-determination.'

*Id.,* 377 Pa.Superior Ct. at 101–02, 546 A.2d at 1177 (citations omitted). *See also Commonwealth v. Schneider,* 386 Pa.Super. 202, 206–07, 562 A.2d 868, 870 (1989) (accord).

The instant record indicates that Probst's waiver comported with the requirements of *Carter.* Furthermore, not only did Probst express his willingness to discuss the case with the officers, but he repeatedly told the police that he wanted to help in any way that he could. *See* Randall Probst, Videotaped Interview, March 28, 1988, at 2, 3, 11, 13, 19, 24, 26, 27, 29, 33, 38, 47. *See also* N.T., June 12–14, 1989, at 36 (Lt. Preziosi testified that Probst was videotaped voluntarily).[6] We are satisfied that the trial court properly ruled to deny Probst's motion to suppress.

■ Probst next contends that the trial court erred in allowing the Commonwealth's expert witness to render an opinion regarding the amount of time that elapsed before the victim's body cooled to eighty five degrees. As both the Commonwealth and the defense correctly noted, the purpose of expert testimony is to aid the jury in understanding matters beyond the average layperson's knowledge or experience. *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988); *Commonwealth v. O'Searo,* 466 Pa. 224, 229, 352 A.2d 30, 32 (1976) (accord); *Commonwealth v. McNeely,* 368 Pa.Super. 517, 534 A.2d 778 (1987) (accord). *See*

---

**6.** After reading Probst's videotaped interview, we have made two observations. First, during the interview, Probst did not affirmatively request the presence of an attorney. *See Commonwealth v. Hubble,* 509 Pa. 497, 504 A.2d 168 (1986) (a defendant must first invoke his right to counsel before the principle of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) will apply). Second, Probst never actually confessed to the commission of the crime. Thus, even if we were to determine that the trial court erred in not suppressing Probst's statement, the error was harmless. *Commonwealth v. Terry,* 513 Pa. 381, 403, 521 A.2d 398, 409 (1987) ("Under our harmless error test, an error is harmless if it does not prejudice the defendant, or the effect on the jury is minimal"). We note that Probst did not challenge the sufficiency of the evidence. Therefore, we will not speculate as to whether Probst's statement contributed to his verdict.

*Commonwealth v. Emge*, 381 Pa.Super. 139, 553 A.2d 74 (1988) (admission of expert testimony lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion). *See also Commonwealth v. Hamilton*, 459 Pa. 304, 329 A.2d 212, 215 (1974). In the instant case, Dr. Mihalikus, a forensic pathologist, testified about the cooling rates of bodies after death. Deemer was not dead; however, her body had cooled to a temperature of eighty five degrees.

Mihalikus testified that the victim's body temperature was eighty five degrees when she was admitted to the hospital. He stated that her body would have been cooling for at least eight hours before her arrival.[7] Probst contends that Mihalikus' testimony was speculative and prejudicial because he had no factual basis for his opinion. He also asserts that Mihalikus failed to consider that Deemer had ingested drugs and alcohol; nor did he account for the forty to fifty percent blood volume loss. Probst therefore concludes that Mihalikus' testimony "failed to meet the requirements of competent, admissible expert evidence." (Appellant's brief, at 18).

Conversely, the Commonwealth argues that the testimony was relevant. *See* N.T., June 12–14, 1989, at 194–97. *See also* Trial Court opinion, at 4 (this evidence was relevant for the purpose of determining the time the victim was attacked). We agree.

Probst testified at trial that after he and Deemer returned home, he went to sleep on the couch. He awoke to Deemer's mother's telephone call.[8] Probst told her that Deemer had left the prior evening and indicated that he had not seen her since. Probst testified that after he hung up the phone, he fell asleep again. Later, when he awoke, he

---

7. Mihalikus based his estimation on an average body temperature of ninety nine degrees, Deemer's approximate weight (one hundred and ten pounds) and height (five foot four inches), a room temperature of 60–70 degrees and an assumption that the victim was dead. He also accounted for the carpeted floors and the fact that Deemer was nude. N.T., June 13, 1989, at 198–201.

8. Probst testified that he was groggy, sick and still drunk when Deemer's mother called. N.T., June 14–16, 1989, at 148.

found Deemer on the floor, barely alive. N.T., June 14–16, 1989, at 147–54.

The Commonwealth's case was that Deemer had been lying in an injured state since the previous night. It posited that

> the length of time that it would take the victim's body to cool to 85 degrees Fahrenheit would be probative of the length of time she was suffering from her injuries and from that the jury could infer that the victim was at the apartment at least by 2:30 in the afternoon when the Defendant was awake. Since the Defendant was not truthful with the victim's mother the jury could infer that he was attempting to hide the fact that a crime was committed and he was the perpetrator of the crime.

Appellee's brief, at 10–11. Following this rationale, Dr. Mihalikus' testimony was relevant. We have reviewed the testimony at issue. At trial, Dr. Mihalikus clearly explained the theory underlying body heat reduction in deceased individuals. He opined, based on the facts provided to him in the Commonwealth's hypothetical question, that a body would have taken at least eight hours to cool to eighty five degrees. *See* N.T., June 12–14, 1989, at 194–213. Although Mihalikus arrived at his conclusion based on the assumption that the victim was deceased, he clarified that his testimony represented the *shortest* period of time during which a body could have reached eighty five degrees. In fact, when asked if he was speculating, Mihalikus responded, "No Counselor, I don't believe I am speculating because I took the worst possible situation. Where there is no circulation and this body would lose heat faster than any other means. So I gave a base line number of eight hours." *Id.* at 212. *See also id.* at 191–217.

The law is clear that the trial court maintains broad discretion to admit or exclude evidence. In *Commonwealth v. Meadows*, 381 Pa.Super. 354, 553 A.2d 1006 (1989), this Court held that:

> [t]he admission or exclusion of evidence is a matter specifically within the discretion of the trial judge, and we

will not reverse his decision absent an abuse of that discretion. 'The test to be applied in determining the admissibility of such evidence involves weighing the inflammatory nature of this evidence against its essential evidentiary value.'

*Id.*, 381 Pa.Superior Ct. at 366, 553 A.2d at 1012 (citations omitted); *see also Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616 (1985) (the admission or exclusion of evidence rests within the sound discretion of the trial court); *Commonwealth v. Robinson*, 332 Pa.Super. 147, 480 A.2d 1229 (1984) (trial court's decision to admit or exclude evidence will not be disturbed absent an abuse of discretion). In the instant case, the trial court determined that there was a clear factual and logical basis for the expert opinion. Trial Court opinion, at 4. After an independent review of the record, we conclude that Mihalikus' testimony involved facts and subject matter which extend beyond the knowledge or experience of an average layperson. The doctor expressed his opinion with a reasonable degree of medical certainty. N.T., June 12–14, 1989, at 200–01. We see no reason to disturb the trial court's decision to admit Mihalikus' testimony into evidence.

■ Probst finally claims that the trial court erred in allowing the Commonwealth to present evidence of Probst's prior bad acts, to wit, that Probst tried to force Deemer to swallow the anti-depressant Elavil on a prior occasion.[9] The Commonwealth argues that the evidence was relevant and admissible to show Probst's identity,[10] and to refute his contention that Deemer voluntarily ingested the drugs.

**9.** In the instant case, the drug Elavil was found in Deemer's bloodstream. The Commonwealth contends that this evidence was germane to its theory that Probst tried to harm Deemer mortally on this occasion. The Commonwealth argues that Probst's first attempt to kill Deemer was relevant to show both his motive and his intent to cause her injury in the instant situation; it asserts that both incidents involved attempts to force Deemer to ingest the Elavil pills. *See Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835 (1989). Here, Probst was being prosecuted for attempted homicide, in addition to aggravated assault and reckless endangerment.

**10.** Probst denied that he was the assailant.

56

■ The law relative to this issue is established. Evidence of prior bad acts is inadmissible to show a defendant's propensity to commit a crime. *Commonwealth v. Wheeler*, 518 Pa. 103, 541 A.2d 730 (1988); *Commonwealth v. Lark*, 518 Pa. 290, 308–09, 543 A.2d 491, 497 (1988); *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987). However, there are exceptions to the general rule. Evidence of prior crimes or bad acts may

> be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one intends to prove the other; (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. (Citation omitted).

> This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury. (Citation and parenthetical omitted). Such evidentiary issues are addressed to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. (Citation omitted).

*Id.,* 513 Pa. at 350, 521 A.2d at 17; *Commonwealth v. Bond,* 261 Pa.Super. 311, 396 A.2d 414 (1978) (accord; admissibility must be the result of a balancing test). *See also Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835 (1989) (evidence of prior bad acts is admissible to show motive and intent); *Commonwealth v. Watson,* 355 Pa.Super. 160, 512 A.2d 1261 (1986) (accord); *Commonwealth v. Smith,* 341 Pa.Super. 564, 492 A.2d 9 (1985) (accord); *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841 (1983) (accord). *See also Commonwealth v. Lawson,* 519 Pa. 175, 546 A.2d 589, 593 (1988) (extrinsic offenses are admissible to prove intent, plan, scheme, identity, ... "pro-

vided that [ ...] these factors are genuinely in issue and qualify for admission on grounds of relevancy and probative value").

In the instant case, the trial court allowed the Commonwealth to ask Deemer about an incident that occurred two months prior to the stabbing, during which time Probst wanted Deemer to ingest Elavil pills so that people would think that she committed suicide. N.T., June 12–14, 1989, at 132. Probst put the pills in her drink. When Deemer refused to ingest them, Probst threw the glass against a wall. *Id.*[11] Probst argues that

> [t]he prior bad act and the current offense are completely unrelated. The current offense involves a slashing incident not an aborted attempted homicide by forced overdose. On the other hand, the prejudicial affect [sic] is overwhelming. The jury was likely to conclude that the appellant committed the instant offense because he tried to kill the victim previously and he was a bad person who would commit such an offense.

Appellant's brief, at 20.[12]

The trial court adequately disposed of this issue in its opinion. It stated:

> The Commonwealth's evidence was that there was Elavil in the victim's system when tests were done after her body was found and that the victim denied having taken any such substance. Elavil pills were found on the floor near her body in the apartment and the Commonwealth provided evidence that the Defendant was taking Elavil

**11.** This story was corroborated by Wayne Gray, Probst's former co-worker. N.T., June 12–14, 1989, at 162–66. In his brief, Probst alerts us that no charges were ever filed against him as a result of this first incident.

**12.** Probst also asserts in his brief that the Commonwealth failed to establish that he forced Deemer to consume Elavil at the time of the instant offense. Aside from the fact that Deemer was knocked unconscious, and therefore could not have voluntarily ingested the drugs, the evidence was circumstantially sufficient to inculpate Probst. *See Commonwealth v. Dawson,* 464 Pa. 254, 346 A.2d 545 (1975) (circumstantial evidence may be sufficient to establish guilt beyond a reasonable doubt); *see also Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101 (1988) (convictions sustained by circumstantial evidence may not be based on mere suspicion or conjecture).

as a prescription drug at the time and the victim testified that on a prior occasion he had attempted to force her to involuntarily consume some of that drug. The Defendant testified that on the night in question the victim had voluntarily ingested some of that drug and the Defendant had attempted to force her to spit it out by slapping her on the back. Expert testimony was produced that in the victim's condition, she could have been induced to swallow some of the medicine. In light of the facts, the evidence of the prior conduct by the Defendant toward the victim was relevant as tending to explain the presence of Elavil in her blood and the presence of Elavil pills on the floor near her body and therefore the post trial motions on these issues are denied.

Trial Court opinion, at 3–4.

We conclude that the trial court did not err in permitting the Commonwealth to introduce evidence of Probst's past conduct. Its admission was appropriate as an exception to the general standard regarding the inadmissibility of evidence of prior bad acts. *See also Commonwealth v. Laskaris*, 385 Pa.Super. 339, 561 A.2d 16 (1989) (evidence is admissible if its probative value outweighs its prejudicial impact). Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.