644 A.2d 1223

**COMMONWEALTH of Pennsylvania**

v.

**John I. REED, Appellant.**

Superior Court of Pennsylvania.

Submitted March 30, 1994.

Filed June 8, 1994.

38

Linda F. Gerencser, Asst. Public Defender, Lancaster, for appellant.

Christopher A. Hackman, Asst. Dist. Atty., Lancaster, for Com., appellee.

40

Before CAVANAUGH, WIEAND and OLSZEWSKI, JJ.

OLSZEWSKI, Judge.

This is an appeal from the judgment of sentence entered against John Reed. A jury convicted him of indecent assault and corruption of minors, and acquitted him of attempted rape. He contends that the trial court violated his confrontation rights by severely limiting his cross-examination of the victim. He also claims that he should have been permitted to impeach the victim regarding her past sexual conduct. After a careful consideration of the issues presented, we vacate the judgment of sentence, and remand for a new trial on indecent assault.

Reed and the alleged victim, fourteen-year-old L.R., had a sexual encounter in a public restroom located in Lancaster County Park. All persons involved largely agree on the events which led to the interlude and it is undisputed it actually occurred; the only real dispute is whether it was consensual. On May 4, 1992, Reed stopped by his sister's house on his way to pick his girlfriend up from work. L.R., who is a friend of Reed's niece and Reed's son's ex-girlfriend, was visiting. Reed, L.R., and his niece talked for a bit before Reed stated that he had to leave to meet his girlfriend. He asked the girls if they wanted to tag along and they agreed. When Reed arrived at his girlfriend's workplace she had already left, so he turned around and took the girls back home. As he dropped them off, he asked L.R. if she would need a ride home. She responded affirmatively and, although he left for a while, Reed returned to give L.R. her ride.

At this point the accounts diverge. L.R. testified that as Reed approached the park, he entered it and asked her to check and see if anyone was in the men's restroom. L.R. agreed, and as she entered the bathroom, Reed grabbed her by her coat. He forced her into the bathroom, demanded that she remove her clothes, and attempted to have intercourse. He was unsuccessful in achieving penetration because L.R. wiggled spryly, making penetration impossible. Reed contended, conversely, that L.R. was unusually frank and de-

scribed having intercourse with his son during the initial car ride. During the second ride, the two were joking about sex and Reed innocently posited that they have intercourse. L.R., after being assured that Reed would not tell his son what happened, agreed and told him to pull into the park, because she had "done it there before." They entered the restroom, disrobed, and L.R. asked Reed if he had a condom. He replied that he didn't, and thus he rubbed his penis on her stomach until he achieved ejaculation.

I.

Reed's first issue centers on his efforts to impeach L.R.'s testimony. Reed has two impeachment theories, both of which were disallowed at trial. He wanted to establish that L.R.'s testimony was fraught with bias and improper motive. Not only was she involved in a past sexual relationship with Reed's son, but she was also abused by her mother. He contends (apparently) that the former would prove that L.R. would be "out to get" her former lover, and that Reed could be the perfect target. Furthermore, he contends that L.R. fabricated the rape allegations because if her mother found out the truth, she would harm her. We will address Reed's arguments in turn.

a.

Reed contends first that his confrontation rights under the Pennsylvania Constitution were violated when the trial court refused his attorney access to CYS file. The CYS file allegedly contained information germane to L.R.'s abusive relationship with her mother. Although the trial court ordered the file's release, it reviewed it and determined that it did not contain any material information. Reed claims that without his attorney's review of the file "with an advocate's eye," his right to cross-examine L.R. was meaningless. We disagree.

Our state supreme court held, under the United States Constitution, that CYS files must be disclosed to defense counsel for review. *Commonwealth v. Ritchie,* 509 Pa. 357, 502 A.2d 148 (1985), *reversed,* 480 U.S. 39, 107 S.Ct. 989, 94

L.Ed.2d 40 (1987). The United States Supreme Court, however, held that the Confrontation Clause was a trial right, not a discovery tool. So long as the defendant is given a meaningful opportunity to cross-examine *at trial,* the confrontation clause is not implicated. 480 U.S. at 53, 107 S.Ct. at 999. Under the Fourteenth Amendment's Due Process Clause, however, the defendant should have access to relevant information in the CYS file, since the relevant privilege statute envisions disclosure of otherwise protected information in limited circumstances. *Id.* at 59, 107 S.Ct. at 1002.[1] The Court concluded that an *in camera* inspection by the trial court is adequate to protect the defendant's due process rights. *Id.* This court subsequently held that this rationale should apply equally to a challenge under our state constitution's confrontation clause. *Commonwealth v. Nissly,* 379 Pa.Super. 86, 549 A.2d 918 (1988), *alloc. denied,* 522 Pa. 595, 562 A.2d 319 (1989).

In *Commonwealth v. Lloyd,* 523 Pa. 427, 567 A.2d 1357 (1989), however, our Supreme Court found that the Pennsylvania Constitution provided an accused greater confrontation rights than the Federal Constitution. There, the court held that a common law psychotherapist privilege should give way to a defendant's right to confront the patient with statements she made that are material to the accusation, and that *in camera* inspection is insufficient to protect this right. Our Supreme Court acknowledged that *Ritchie* was overruled, but declared that "the issue before us arises not under the federal constitution but under our State Constitution and does not involve a request to discover statutorily protected state maintained records but rather a request to produce Psychotherapy records in the possession of the hospital where treatment was administered." *Id.* at 431, 567 A.2d 1357. In this case, the trial court held that since *Lloyd* specifically excepted statutory privileges, *Ritchie* applies here. Reed urges that *Lloyd* ap-

---

1. The relevant statute provides that reports written by child protection service agents shall be confidential and made available only to, among other entities, "a court of competent jurisdiction pursuant to a court order." 11 Pa.C.S.A. § 2215(a)(5) (repealed). The current privilege is codified at 23 Pa.C.S.A. §§ 6339 and 6340(a)(5), and includes identical provisions insofar as this case is concerned.

plies because our Supreme Court adopted its original *Ritchie* rationale (which interpreted the United States Constitution) under the state constitution.

We agree with the trial court. Our Supreme Court addressed a very similar claim in *Commonwealth v. Wilson,* 529 Pa. 268, 602 A.2d 1290 (1992), where defendant claimed that his confrontation rights should entitle him to subpoena his victim's rape trauma counselor, despite the latter's absolute statutory privilege of confidentiality. After recognizing that the United States Confrontation Clause was not implicated because defendant was provided the opportunity to cross-examine the victim, our Supreme Court refused to apply *Lloyd* in response to defendant's argument that his state right to confrontation was violated. The Supreme Court explained:

> The [*Lloyd*] court voted, however, that the *Lloyd* case, unlike the *Ritchie* case, did not involve a statutory privilege. Rather, the court in *Lloyd* was concerned with a common law privilege which could not defeat a defendant's rights. Implicit in the distinction drawn by the *Lloyd* court is the recognition that the existence of a statutory privilege is an indication that the legislature acknowledges the significance of a particular interest and has chosen to protect that interest.

*Id.* at 282, 602 A.2d at 1298.

We feel that our Supreme Court's acknowledgment of *Ritchie*'s distinction controls the outcome here. That is, in *Ritchie,* the Supreme Court held that due process required that an in camera inspection be held to determine whether the information in the CYS file was relevant to the defendant's case. *Wilson*'s acknowledgment of this rationale under our state confrontation clause indicates that, although our state confrontation rights might be more protective than those under the federal constitution, there is still a need to balance the legislature's choice to maintain confidentiality of certain materials against the right of a defendant to confront a victim with relevant information at trial. Thus, in *Wilson,* the court held that an absolute statutory privilege allowed a defendant no access to protected statements. *Id.; see Commonwealth v.*

*Kyle,* 367 Pa.Super. 484, 533 A.2d 120 (1987) (state interest in protecting statements made to psychiatrist outweighs defendant's right to any disclosures), *alloc. denied,* 518 Pa. 617, 541 A.2d 744 (1988).

■ Here, the statutory privilege is nearly identical to the one presented in *Ritchie* and allows for disclosure of any information in CYS files upon court order. 23 Pa.C.S.A. § 6340(a)(5). We therefore find that the balance struck by the United States Supreme Court in *Ritchie* (requiring an in camera inspection for relevant information) applies with equal force under our state confrontation clause, despite *Lloyd.* Where the legislature has enacted a privilege, *Wilson* makes it clear that the confrontation clause does not provide a defendant with unfettered access to the privileged statements. We feel, given the legislature's contemplation that CYS file materials may be disclosed pursuant to court order, that an in camera inspection was sufficient in this case to protect both the defendant's right to meaningfully cross-examine his victim and the state's right to keep this information confidential.

### b.

Reed contends next that the trial court violated his confrontation rights by precluding him from cross-examining L.R. regarding her relationship with her mother.[2] The trial court claims that it did not preclude this line of questions and, in any event, it was irrelevant. We agree with Reed and award him a new trial.

First, our review of the record leads us to the conclusion that, despite the Commonwealth's and trial court's contentions, the trial court precluded Reed from pursuing his theory that L.R. fabricated the rape charge because she was afraid of her mother. Reed's counsel asked L.R. during cross-examination whether she dated Reed's son and whether his son was now dating another girl. The Commonwealth objected to the question and Reed's counsel offered a lengthy offer of proof.

---

**2.** The trial court disallowed impeachment on both of Reed's theories, but Reed only posits here that he should have been allowed to question L.R. with respect to her motive to lie to her mother.

He explained that L.R. was expelled from school because she threatened to kill the person whom Reed's son was currently dating. He also explained that L.R. was disciplined at school because of various outbursts, and that school officials were aware of her abusive relationship with her mother. Counsel stated:

We have a child who is afraid of her mother, we have abusive situation referred to children and youth we have this situation. I think that sets forth this situation where she made up a story or put the blame on [Reed] to avoid being beaten by the mother and that we have the mother being in a position to make that call [to police reporting the rape].

The most important thing is the motivation for her to lie. We have that again and again with this abusive parent and to receive punishment, to go ahead and put the blame on someone else.

In addition to that, we have the animosity to the son because he's seeing someone else and the extent of the animosity and the extent of her anger is evidenced by the uncontroverted fact of these knife incidents that she threatened to kill this Star person and was expelled from the school. This is not—this is important. I think the jury needs to know this, about these threats.

N.T. 1/7/93, at 252. The trial court sustained the Commonwealth's objection to both impeachment theories:

I can't see and I'll state for the record as to what this defendant's son's activities with another girl has to do with showing bias that this witness would accuse the defendant of these charges plus whether or not this witness got expelled from school and the reasons for that are totally irrelevant and *I'll sustain your objection to all of this proffered evidence.*

*Id.* at 153 (emphasis added). The trial court's assertion that it did not preclude Reed from exploring L.R.'s motive to lie is contradicted by what it said at trial. Reed did not abandon

this claim or fail to raise it. He made an affirmative attempt and was rebuked.[3]

It is, moreover, a fundamental proposition that a defendant be permitted to cross-examine a Commonwealth witness to explore her motive to fabricate testimony. *Commonwealth v. Robinson*, 507 Pa. 522, 491 A.2d 107 (1985). "It is particularly important that, where the determination of a defendant's guilt or innocence is dependent upon the credibility of a prosecution witness, an adequate opportunity be afforded to demonstrate through cross-examination that the witness is biased." *Commonwealth v. Birch*, 532 Pa. 563, 565, 616 A.2d 977, 978 (1992). Although the trial court is vested with broad discretion to limit the scope of cross-examination, excluding an inquiry into bias will often be an abuse of that discretion.

> It is always the right of a party against whom a witness is called to show by cross-examination that he has an interest direct or collateral in the result of the trial.... The right is not to be denied or abridged because incidentally facts may be developed that are irrelevant or prejudicial to the other party.... On the facts of this case ... where the credibility of [the prosecution witness] was crucial to the guilt or innocence of the accused, it was an abuse of discretion for the court not to permit cross-examination as to [the prosecution witness'] bias.

3. We acknowledge that, arguably, the trial court's use of the phrase "all of this proffered evidence" refers only to the bias theories explicitly mentioned in the trial court's ruling. Although we would normally agree with the trial court's conclusion that if defense counsel was confused about the scope of the ruling he should have asked for clarification, the record makes it clear that the trial court believed that the "abusive relationship" impeachment theory was irrelevant. For example, during Reed's case-in-chief, counsel wanted to call a witness, Ceena Getz, to testify regarding L.R.'s relationship with her abusive mother. The Commonwealth objected on relevancy grounds, and the trial court sustained the objection. N.T. 1/8/93. Thus, viewing the record as a whole, it is apparent that even if defense counsel had sought a clarification of the trial court's ruling, he still would have been precluded from asking L.R. about her relationship with her mother, a line of questions that, as we discuss below, was entirely relevant to impeach.

*Id.* at 566, 616 A.2d at 979 (quoting *Commonwealth v. Cheatham*, 429 Pa. 198, 203–204, 239 A.2d 293, 296 (1968)); *Commonwealth v. Robinson, supra.*

■ Here, too, the Commonwealth's case against Reed relied almost exclusively on L.R.'s credibility. If she lied to her mother about the incident in order to protect herself, it is vital that Reed at least be entitled to pursue the issue on cross-examination.[4] Indeed, the premise of *Ritchie, supra,* is that the confidentiality of CYS materials may be protected so long as the victim is cross-examined at trial. When the Supreme Court decided that the federal confrontation clause does not include pre-trial discovery techniques, it stated that "[n]ormally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees the opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.,* 480 U.S. at 53, 107 S.Ct. at 999 (emphasis in original).

Reed was not given an opportunity to cross-examine L.R. regarding her potential motive to fabricate testimony, an opportunity to which he is constitutionally entitled. We wish to emphasize that this is distinct from his right to review the CYS file—a right to which he is not entitled. When the trial court denied Reed the opportunity to question L.R. for improper motive, it not only abused its discretion, but denied Reed a constitutional right as well.

c.

■■ Finally, we feel obligated to address an issue not raised by the Commonwealth, that is, whether the error actually affected the outcome of the trial. An error is harmless, precluding retrial, when we are satisfied beyond a reasonable doubt that it did not affect the jury's verdict. We find that the error was prejudicial with respect to the indecent

4. Although not presented directly, we feel differently with regard to Reed's theory about L.R.'s hostility toward Reed's son. Any suspicion that L.R.'s hostility toward her ex-boyfriend's new relationship would "spill-over" toward Reed is entirely speculative and properly excluded.

assault conviction, but harmless with regard to corruption of the morals of a minor.

Because the credibility of L.R.'s testimony went untested, the jury could have given more weight to her account of the events than it would have otherwise. As a result, it was more likely to determine that the interlude was forcible. This clearly brings Reed's indecent assault conviction into question because lack of consent is an element of that crime. 18 Pa.C.S.A. § 3126. In a corruption of minors prosecution, however, consent is never an issue. *Commonwealth v. Anderson,* 379 Pa.Super. 589, 550 A.2d 807 (1988); *Commonwealth v. Bricker,* 397 Pa.Super. 457, 580 A.2d 388 (1990), *alloc. denied,* 527 Pa. 596, 589 A.2d 687 (1991); 18 Pa.C.S.A. § 6301. So long as the Commonwealth pleads and proves that an underlying act (without regard to consent) tends to corrupt the morals of a minor, a conviction for corruption will stand. *Anderson, supra* (acquittal for indecent assault not inconsistent with conviction for corruption of the morals of a minor).

Here, Reed admitted that the act underlying the corruption charge occurred; his only contention was that the act was consensual. As such, the corruption conviction would have been proper even if the jury credited his account of the events. In other words, since the error in this case affected the jury's ability to evaluate whether the sexual interlude between L.R. and Reed was consensual, it could have had no bearing on the jury's conviction for a crime in which consent is irrelevant. Our grant of a new trial, therefore, will be limited to the indecent assault charge. As for corruption of the morals of a minor, however, the error was harmless and the conviction for that offense shall stand. We will, however, order that the entire judgment of sentence be vacated and resentencing on the corruption charge will be necessary.[5]

5. Although we find that the corruption conviction was proper—and retrial on that crime unnecessary—we must vacate the entire judgment of sentence. Upon reviewing the transcript from the sentencing hearing, it is apparent that the trial court considered the jury's belief that the event was forcible as an aggravating factor in imposing sentence for corrupting the morals of a minor. It stated:

## II.

Reed complains next that the trial court should have permitted him to explore L.R.'s past sexual conduct. He claims that although the Rape Shield Law generally prohibits testimony regarding a rape victim's past conduct, the Commonwealth opened the door to the issue by presenting testimony that L.R. was a virgin. Although we disagree with his conclusion, we do agree somewhat with his premise and address this issue so that the problems at trial will not reoccur.

During her direct testimony, L.R. stated that she and Reed's son, John John, were once in a relationship, but that it had ended:

Q: Did you ever meet Mr. Reed before [the day of the incident]?

A: When we went to his son's party.

Q: Is that the only other time?

A: Yeah.

Q: How long have you known his son?

A: I don't know.

Q: What kind of relationship do you have with his son?

A: Nothing now.

Q: Did you before?

I have, in addition, considered the legislature in enacting the sentences which are applicable to these particular crimes, considered them to be, especially the corruption of minors, very serious, and I cannot escape the fact that we have a thirty-seven-year old, mature man, supposedly a responsible individual, offering a ride to a four-teen-year-old girl, and if you want to believe what the jury believed, taking advantage of her. *They did not convict you of rape, Mr. Reed, but they certainly believed you assaulted her sexually.*

N.T. 8/31/93, at 39 (emphasis added). As we have tirelessly explained, the jury's factual finding with respect to L.R.'s credibility cannot be trusted and therefore cannot, at this point, be considered for any reason. We must therefore vacate the entire judgment of sentence, as it appears that the sentence for indecent assault (or the factual findings supporting it) affected the corruption sentence. *See Commonwealth v. Williams*, 379 Pa.Super. 538, 550 A.2d 579 (1988), *alloc. denied*, 522 Pa. 612, 563 A.2d 498 (1989). We decline to comment on whether the forcible nature of an act may be considered at all in sentencing for corrupting the morals of a minor, in light of the well-settled proposition that consent is irrelevant to that crime.

A: Yeah.

Q: What was it before?

A: We were just talking and stuff.

Q: Were you friends?

A: No, we were boyfriend and girlfriend but we didn't do nothing.

Q: What happened after Mr. Reed came to the house?

N.T. 1/7/93 at 216. On cross-examination, Reed questioned L.R. about the events of the day. He was particularly interested in discerning the nature of the relationship with John John, because it was his claim in defense that L.R. was boastful about her past sexual conduct during the car ride which led to the interlude. Counsel pursued the issue:

Q: During this first ride—excuse me. Before you left the house, Mr. Reed asked you if you wanted to go with him to pick up his wife, is that right?

A: Yeah.

Q: Okay, good. And you left and on the way there, you and Missy were talking, weren't you.

A: Yeah.

Q: You were talking about boys, weren't you?

A: No.

Q: You weren't talking about John John?

A: No.

Q: Now, are you telling me that you didn't say anything about having sex with John John?

*Id.* at 236. The trial court sustained the Commonwealth's objection to this inquiry and precluded Reed from pursuing the topic of L.R.'s sexual relationship with John John.

Furthermore, the Commonwealth introduced the testimony of the treating physician, who explained the revelations of his examination. The doctor testified that he did not conduct an internal investigation of L.R. because objective criteria did not indicate that she had actually been raped:

I did not do a full internal examination for two reasons. One, my external examination revealed that the hymen was

intact indicating that there was no penetration, there was no signs of trauma to the external genitalia and both she and—well, she had stated that there was no penetration and she was very upset and terrified of having an internal exam, and after my external exam, I felt it wasn't necessary ...

N.T. 1/7/93 at 271. Although the prosecutor made no reference at the time to the possibility that the doctor's testimony might prove that L.R. has never had intercourse, the Commonwealth used the doctor's testimony offensively during its closing argument by questioning the credibility of Reed's story:

Does it make sense and does the rest of what he said make any sense? There was testimony that he asked her if his son's dick is big. And then he also asked her if she would like to do it with him. Does that make sense that he went back there to give her a ride home and as soon as she got in the car he said would you like to do it with me and this 14–year–old girl said sure, I do it all the time let's go to the county park in the restroom. Does that make sense?

Dr. Fisher testified that this girl's hymen was intact. She never had sex with anybody. Does his version make sense in light of the physical evidence?

N.T. 1/8/94 at 464–465. After closing arguments, the court denied Reed's motion for a mistrial and also his motion to reopen the case to explore the extent of L.R.'s sexual contact with John John.

■ The Pennsylvania Rape shield statute prohibits the admission of "evidence of specific instances of the alleged victim's past sexual conduct," unless the prior conduct occurred between the victim and the accused and is relevant to prove consent. 18 Pa.C.S.A. § 3104. Although the rule seems clear enough, the defendant's right of confrontation does not allow an absolute proscription against all instances of prior sexual conduct. *Commonwealth v. Wall,* 413 Pa.Super. 599, 606 A.2d 449, *alloc. denied,* 532 Pa. 645, 614 A.2d 1142 (1992). When the evidence of prior sexual conduct might tend to prove that the victim had a motive to fabricate the accusation, it should be admitted if its probative value outweighs its

prejudicial effect. *Commonwealth v. Black*, 337 Pa.Super. 548, 487 A.2d 396 (1985). For example, in *Wall, supra*, the victim was removed from her mother's care after she successfully prosecuted a sexual assault against her mother's paramour. When the victim accused Wall of sexual assault, the prior sexual conduct was admissible when the evidence established that the victim wanted to be released from the care of Wall's wife (the victim's aunt). Based on her prior experience, it helped prove that the victim knew she could leave her aunt's care if she brought successful charges of abuse from within the household. Of course, as in *Wall*, the proffered evidence must always be relevant and the trial court has wide discretion to exclude it. *See also Commonwealth v. Smith*, 410 Pa.Super. 363, 599 A.2d 1340 (1991).

Here, it is important to distinguish between two aspects of the proffered evidence. First, did L.R. actually *perform* sexual intercourse with John John? Second, did L.R. actually *say* to Reed that she had sex with John John? We have no trouble concluding that the first inquiry is entirely irrelevant in this case. L.R. may or may not have actually had sex with John John, but it does not advance the inquiry of whether Reed forcibly attempted to have intercourse with her. What does advance the inquiry, however, is whether L.R. actually said that she did, because it lends credibility to Reed's story. Simply stated, the truth of any assertion made by L.R. in the car does not matter, but whether she made the assertion at all is relevant because it helps explain Reed's state of mind during the car trip.

Reed might like to establish that the statement is true because if L.R. really did have sex with John John, it might help explain why she boasted in the car. This would inevitably make Reed's story more believable, because as it stood, why would L.R. lie and claim to Reed that she had intercourse with his son? We are not convinced, however, that the potential value of the testimony necessarily renders it admissible. The Rape Shield Law is designed to exclude evidence where its potential to distract the jury and embarrass the witness outweighs its value. Here, the jury could still find

that L.R. actually boasted even if she had never had sex. As we stated, the only reason the statements could have been allowed in at all was to prove the *effect* they might have had on Reed. Allowing him to prove the truth of those statements, once admitted into evidence, to prove that they were actually made, is nothing more than a bootstrap. The value of the evidence is minimal and its potential to distract great.

Reed should have been permitted to question L.R. regarding whether she made the statement, however. The Rape Shield Act prohibits proof of "specific instances" of past sexual conduct. Here, counsel did not attempt to establish any instances of past conduct, but only whether she made a particular statement. As we discuss above, the statement itself refers to past conduct, but was not admitted for its truth. Therefore, the stigma that one might normally attach to past sexual conduct—that the victim's promiscuity proves that she "asked for it"—is not present because no past conduct is being used against her. What is being used to challenge the victim here is the potential that she made statements, for whatever reason, which immediately preceded a sexual interlude which unquestionably occurred. Her motivation behind those statements—seduction, self-promotion, or mere information—is not only relevant, but necessary to enable the jury to piece together the sequence that led to an act for which Reed faces imprisonment.

 Furthermore, we disapprove of the Commonwealth's efforts to use L.R.'s lack of prior sexual conduct to discredit Reed's testimony when it managed to exclude any positive evidence of L.R.'s prior sexual conduct. "The Rape Shield Law was intended to be a shield not a sword." *Commonwealth v. Berkowitz*, 415 Pa.Super. 505, 532, 609 A.2d 1338, 1352, *alloc. granted*, 531 Pa. 650, 613 A.2d 556 (1992). Here, the Commonwealth sought to exclude any references to L.R.'s potential prior sexual conduct with John John, then argued since L.R. was a virgin, Reed's story was unbelievable. Not only, as we have discussed at length, is L.R.'s actual sexual history entirely irrelevant to this case, its use by the Commonwealth here was prejudicial because it could have led the jury

to believe that it was relevant. If the Commonwealth wants to keep L.R.'s past out of the case, it must do exactly that.

### III.

In sum, then, we find that the trial court erred in foreclosing Reed's effort to cross-examine L.R. with regard to whether she had an improper motive to accuse him of a crime, and whether she stated that she had prior sexual intercourse with John John. We therefore vacate the entire judgment of sentence, grant a new trial with respect to the charge of indecent assault, and remand for resentencing on the corrupting the morals of a minor charge. Reed cannot, upon retrial, have access to the CYS file unless the trial court determines, after an in camera hearing, that it contains information material to the case. Any inquiry into specific acts of L.R.'s past sexual conduct is irrelevant and should be precluded under the Rape Shield Law.

The judgment of sentence is vacated in its entirety. The case is remanded for a new trial on the indecent exposure charge, and for resentencing on the charge of corruption of the morals of a minor. Jurisdiction is relinquished.

CAVANAUGH and WIEAND, JJ., concur in the result.