675 A.2d 295

**COMMONWEALTH of Pennsylvania**

v.

**Michael P. WEBER, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 31, 1996.

Filed April 11, 1996.

Richard J. Makoul, Allentown, for appellant.

Victoria Coyle, Assistant District Attorney, Bethlehem, for Commonwealth, appellee.

Before CAVANAUGH, EAKIN and OLSZEWSKI, JJ.

OLSZEWSKI, Judge:

On January 20, 1994, appellant Michael Weber was arrested and charged with numerous counts of rape,[1] statutory rape,[2] involuntary deviate sexual intercourse,[3] aggravated indecent assault,[4] indecent assault,[5] and corruption of minors.[6] These charges stemmed from his daughter's (Daughter's) accusations that Weber had continuously forced her to engage him in sexual relations during the ten years following her eighth birthday. The Honorable Jack A. Panella presided over Weber's four-day trial and the jury returned guilty verdicts on all charges. Judge Panella sentenced Weber to 20–to–64 years imprisonment. In his timely appeal, Weber asks us to the review the following issues:

1. Whether the trial court erred in applying the Rape Shield Law to preclude the defendant from introducing, and commenting upon during summation, testimony concerning a fabrication defense.

2. Whether trial counsel was ineffective for failing to object to certain sidebar comments made by the trial court in a voice audible to the jury.

1. 18 Pa.C.S.A. § 3121(1).
2. 18 Pa.C.S.A. § 3122.
3. 18 Pa.C.S.A. § 3123(1).
4. 18 Pa.C.S.A. § 3125(1).
5. 18 Pa.C.S.A. § 3126(A)(1).
6. 18 Pa.C.S.A. § 6301.

3. Whether trial counsel was ineffective for failing to object to testimony concerning the defendant's illicit thoughts regarding other minor children.

We find merit in Weber's first contention and vacate his judgment of sentence and remand this case for retrial. Thus, we need not address his remaining claims of error.

Pennsylvania's Rape Shield Law reads as follows:

**§ 3104 Evidence of victim's sexual conduct.**

(a) General Rule.—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victims past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104.

At trial, Weber sought to introduce evidence that Daughter was pregnant and planning an abortion but was afraid that Weber would find out and physically punish her. This evidence, Weber asserts, establishes Daughter's motive to fabricate the sexual abuse story: a pre-emptive strike to avoid the impending beating.

In arguing that the evidence should have been properly admitted, Weber first contends that Daughter's planned abortion constitutes a "clinical procedure" rather than "sexual conduct" and, thus, our state's Rape Shield Law does not apply. We disagree. While no Pennsylvania case has addressed this specific issue, we are mindful that the Pennsylvania Supreme Court has demonstrated a preference for broadly construing our state's Rape Shield Law. In *Commonwealth v. Berkowitz*, 537 Pa. 143, 641 A.2d 1161 (1994), defendant, who had been charged with rape, sought to introduce evidence that his alleged victim had previously argued with her boyfriend about her fidelity. The defendant, who claimed that intercourse with the victim had been consensual, alleged that the

proffered evidence was relevant to establish that the victim's fear of her boyfriend's jealousy motivated her to claim that sex with the defendant had been forced. In finding that the trial court had properly excluded this evidence, our Supreme Court wrote:

> The purpose of the Rape Shield Law is to prevent a sexual assault trial from degenerating into an attack upon the victim's reputation for chastity. The allegation that the victim and her boyfriend had argued over the issue of her infidelity is so closely tied to the issue of the victim's fidelity itself that, for the purposes of the Rape Shield Law, they are one and the same. This is precisely the type of allegation regarding past sexual conduct from which the Rape Shield Law is specifically designed to protect victims.

*Id.* at 151, 641 A.2d at 1165 (citations omitted).

Likewise, we find that the issue of Daughter's planned abortion is so closely tied to the issue of Daughter's chastity that, for the purposes of the Rape Shield Law, they are one and the same. In reaching this conclusion, we echo the sentiments of our fellow jurist in Indiana:

> A pregnancy which has been aborted can only be the result of "past sexual conduct." This is what the Rape Shield Statute proscribes. The statute ... should ... exclude evidence of termination of pregnancy. Any reference to a prior abortion inherently contains a reference to past sexual conduct.

*Razo v. Indiana,* 431 N.E.2d 550, 554–555 (Ind.App.1982) (by Hoffman, J., with two judges concurring). Consequently, we find that evidence concerning a victim's abortion is properly encompassed within our state's Rape Shield Law.

The fact that our Rape Shield Law applies, however, does not necessarily mean that the offered evidence must have been excluded at trial. As noted above, the purpose of the Rape Shield Law is to prevent a sexual assault trial from degenerating into an attack upon the victim's reputation for chastity. *Berkowitz,* 537 Pa. at 149–51, 641 A.2d at 1165.

At common law, and to some extent even today, a rape victim often suffered secondary abuse at the hands of the judicial system through aggressive defense counsel who essentially put the victim on trial. In response to these abuses, the federal government and the states enacted rape shield laws which were intended to end the abuses by limiting the harassing and embarrassing inquir[ies] of defense counsel into irrelevant prior sexual conduct of sexual assault complainants.

*Commonwealth v. Smith*, 410 Pa.Super. 363, 368, 599 A.2d 1340, 1342 (1991) (citation and quotations omitted). Thus, our Rape Shield Law is needed to "prevent irrelevant testimony relating to the victim's past involvement in sexual activities from being presented to the trier of fact in order to protect the victim from being prejudiced because of unwarranted perception as to her moral character rather than based upon the facts of the case." *Commonwealth v. Riley*, 434 Pa.Super. 414, 420, 643 A.2d 1090, 1093 (1994).

Pennsylvania appellate courts have also recognized, however, that "[t]hough laudable and long-overdue, Rape Shield [L]aws, if rigidly construed, could impermissibly encroach upon a defendant's right to confront and cross-examine witnesses which is secured by the United States and Pennsylvania Constitutions." *Commonwealth v. Nieves*, 399 Pa.Super. 277, 287, 582 A.2d 341, 346 (1990). In *Commonwealth v. Wall*, 413 Pa.Super. 599, 609–14, 606 A.2d 449, 454–57 (en banc), *alloc. denied*, 532 Pa. 645, 614 A.2d 1142 (1992), this Court reconciled these competing interests as follows:

The battle waged between the legislatively created Rape Shield Law and the constitutional right to confront and cross-examine witnesses is by now a familiar one in Pennsylvania. Both this Court and our Supreme Court have served as battlegrounds in this conflict many times before. The task of resolving such disputes, however, remains difficult. . . .

On their face, the two authorities at issue herein may seem to share no common interests. . . . Examined more closely, however, the purposes of the authorities may be, at

least in part, reconciled.... The search for truth, therefore, is a common bulwark upon which both the Rape Shield Law and the Confrontation Clause are built. Thus, in many cases, the intent of both the Rape Shield Law and the Confrontation Clause may be advanced without encroaching upon the other's domain. We must recognize that the defense attorney who kindles the "great engine of cross-examination" to harass or embarrass the victim/witness does so to conceal rather than unveil the truth. Nothing within either the terms or the history of the Confrontation Clause could in any way be interpreted to protect such misguided defense strategy, and thus the operation of the Rape Shield Law in such cases remains unhindered....

It is only where the truth determining process is not forwarded by the exclusion of past sexual history that the Rape Shield Law and the Confrontation Clause may not be reconciled.... In such rare cases, the Rape Shield Law must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence.

*Id.* at 609–14, 606 A.2d at 454–57 (citations and quotations omitted).

 Thus, "the protection afforded to the complainant by the Rape Shield Law does not act to prohibit relevant evidence which may exculpate a defendant of the crime with which he is charged." *Commonwealth v. Spiewak,* 533 Pa. 1, 8, 617 A.2d 696, 699 (1992). Consequently, "[w]hen the evidence of prior sexual conduct might tend to prove that the victim had a motive to fabricate the accusation, it should be admitted." *Commonwealth v. Reed,* 435 Pa.Super. 36, 51, 644 A.2d 1223, 1230 (1994), *alloc. denied,* 540 Pa. 580, 655 A.2d 512 (1995). "Admitting such evidence for the limited purpose of denying the act charged properly balances the goals of the Rape Shield Law with an accused's fundamental right to present in defense his own version of the facts." *Spiewak, supra.*

 Our state's appellate courts have developed an elaborate procedure through which potentially exculpatory evi-

dence, which would otherwise be excluded by the Rape Shield Law, must pass before being admitted at trial.

The process begins with the defendant submitting a **specific** proffer to the court of exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense. This procedure forces the defendant to frame the precise issues and interests involved, and prevents him or her from embarking upon "fishing expedition style intrusions on the Rape Shield law protections." Where the proffer is but vague and conjectural, evidence of the victim's past sexual conduct will be excluded and no further inquiry need be entertained.

*Wall,* 413 Pa.Super. at 614, 606 A.2d at 457 (emphasis original) (citations omitted).

Instantly, Weber filed pre-trial motions on May 6, 1994. On September 7, 1994, Weber submitted supplemental pre-trial motions which contained his proffer concerning Daughter's abortion. Specifically, Weber stated that he sought to introduce the following fact at trial:

B. The Complainant had an abortion at Temple University Health Center in Philadelphia, PA in September, 1993.

1. This act of abortion is an act that would not be condoned by the Defendant. Furthermore this act would cause great tension between the Complainant and the Defendant.

2. This fact would show bias by the Complainant towards the Defendant.

3. This evidence is relevant to the defense of fabrication that will be presented at trial.

Supplemental Pre-trial Motion, 9/7/94 at 2–3.

■ While Weber's proffer may have been brief, we cannot find that it was vague or conjectural. Weber set forth the specific evidence sought to be introduced, *i.e.,* Daughter's September 1993 abortion, and the relevance of this evidence to the defense, *i.e.,* Daughter's fabricating the sexual assault charges in order to avoid a potential clash with Weber once he learned of the abortion. As such, we find that Weber's proffer

in support of admitting evidence of the abortion was adequate. *Wall, supra. Cf. Commonwealth v. Sanders,* 420 Pa.Super. 479, 617 A.2d 5 (1992) (proffer which failed to state specific acts of prior sexual contact held insufficient).

Submitting a proper proffer, however, is but the first step in conquering the procedural rigors of admitting this evidence. "Where the proffer is sufficiently specific, the court must then undertake a three part analysis of the substance of the proffer." *Wall,* 413 Pa.Super. at 615, 606 A.2d at 457. In completing this analysis, the trial court is required to conduct an *in camera* hearing at which it must

> determine the following as a matter of record to be pre-served for appellate review: (1) whether the proposed evidence is relevant to show bias or motive or to attack credibility; (2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive to challenge the credibility.

*Commonwealth v. Black,* 337 Pa.Super. 548, 557–58, 487 A.2d 396, 401 (1985) (*en banc*). Thus, where "the proffered evidence excluded by the Rape Shield law is relevant, non-cumulative, and more probative than prejudicial, it must be admitted." *Wall,* 413 Pa.Super. at 615, 606 A.2d at 457.

The first element of the *Black* test, relevance, is met where the evidence "logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Boyles,* 407 Pa.Super. 343, 353, 595 A.2d 1180, 1185 (1991), *alloc. denied,* 531 Pa. 651, 613 A.2d 556 (1992).

Instantly, Weber sought to introduce the testimony of Michael Weber, Jr. (appellant's son and Daughter's brother) and Michelle LeBar (Michael, Jr.'s girlfriend) concerning a telephone conversation they had had with Daughter on the evening of September 20, 1993. During the course of this conversation, Daughter revealed to the couple that she was pregnant

and planning to have an abortion. More importantly, Daughter pled with the couple not to disclose this information to the appellant because she feared being beaten once Weber became aware of the news. Appellant argues, and we agree, that Daughter's fear of the potential beating was relevant as it established a motive for her to fabricate the sexual assault charges. The timing of her phone conversation is crucial. The conversation occurred September 20, 1993, and Daughter first reported the alleged sexual abuse two months later, on November 20, 1993. The sequential order and proximity in time of these events clearly lend themselves to the logical conclusion that the sexual assault allegations were motivated by Daughter's fear of potential punishment.

Further, Daughter carries a history of submitting false reports to the police in order to avoid expected beatings by her father. In April of 1990, Daughter reported to the Pen Argyl Police Department that she had been kidnapped by two Puerto Rican males in a black van. It was not until the next morning that, under intense questioning by the police, Daughter admitted that she had fabricated the story in an attempt to avoid her father's anger concerning her poor report card grades.

In light of the above, we find that evidence of Daughter's fear of Weber's reaction to her planned abortion was clearly relevant in establishing her motive for fabricating the sexual assault allegations. *See Black, supra* (evidence of daughter's sexual relationship with her brother was held relevant in establishing a motive for her to fabricate sexual abuse charges against their father where father had recently thrown the brother out of the family home); *Wall, supra* (evidence that victim had previously participated in the successful prosecution of a former abuser which resulted in her removal from her mother's home was held relevant in establishing her motive to fabricate sexual assault charges against her uncle where victim sought removal from her disciplinarian aunt and

uncle's house).[7]

The second prong of the *Black* test is whether the probative value of the evidence outweighs its prejudicial effect. Instantly, we do not doubt that the offered evidence would have had a prejudicial impact on Daughter independent of the purpose for which it was offered.

[T]here is . . . a persistent belief among some people that a woman or girl would not be assaulted unless she provoked the assault by acting promiscuously or deliberately placed herself in a situation where an assault could be anticipated. This is particularly so when the parties are known to each other. We have not yet completely disabused the public mind perception that an assault victim is somehow to blame for the assault, and this is even more so with child victims who, due to naivete or poor supervision, find themselves unprotected and dangerously vulnerable.

*Smith*, 410 Pa.Super. at 372–73, 599 A.2d at 1344 (quotation omitted).

While evidence of Daughter's pregnancy and planned abortion would unfortunately raise issues concerning her moral character, this evidence was also critical in establishing her motive for fabricating the charges against the defendant. While the Commonwealth did present witnesses who testified that they had observed bruises upon Daughter's body, no-one directly corroborated Daughter's testimony concerning the years of alleged sexual abuse. In fact, every family member testified that they never witnessed, nor suspected, Weber acting sexually towards his daughter. Moreover, Weber took the witness stand and flatly denied the acts his daughter had accused him of committing. As such,

7. We note that Weber also contends that the Daughter was motivated to fabricate the sexual assault allegations by her fear of losing her father's monetary support once he learned of her pregnancy and planned abortion. This argument is nonsensical. Clearly, filing false sexual assault claims against her father would inevitably result in his refusing any continued financial support. Moreover, the record is devoid of any evidence that Daughter did, in fact, fear loss of financial support as a consequence of her father discovering her pregnancy and planned abortion.

Daughter's credibility was the foundation for the Commonwealth's case against Weber. Under these circumstances, evidence of Daughter's motive to lie may have very well been the difference between Weber's freedom or incarceration. Consequently, we find that the offered evidence's significant probative value outweighed any prejudicial effect it may have had in this case.[8]

The final prong of the *Black* test is whether other evidence, which would not otherwise be precluded by the Rape Shield Law, exists to prove the witness's bias or motive. Instantly, as conceded by the Commonwealth, an abundance of evidence was introduced at trial which reflected poorly upon Daughter's credibility. Particularly damaging were Daughter's own inconsistencies regarding important dates and her prior false kidnapping report to the police. This evidence, however, remains distinct from the motive of avoiding a beating specifically concerning Daughter's pregnancy and planned abortion. Thus, we cannot say that any of the existing evidence, which subjected Daughter's credibility to question, was cumulative of the evidence of her fear of being beaten once her father learned of her pregnancy and planned abortion.

In sum, we find that Weber has successfully established all of the elements of the *Black* test. Despite this finding, we note that the Commonwealth makes much of the

---

8. We do not intend our ruling as a declaration that a defendant may now introduce every instance the child/victim's past sexual conduct under the guise that the child's allegations of sexual assault were motivated by fear of punishment. To do so would "effectively remove children from the protections of the [R]ape [S]hield [L]aw by finding child victims likely to cry 'rape' when confronted by evidence of sexual activity, rather than deal with the possible anger of parents or guardians." *Smith*, 410 Pa.Super. at 373, 599 A.2d at 1345. Rather, in most cases the prejudicial effect of this evidence will outweigh its probative value. Nevertheless, where, at the *in camera* hearing, the defendant offers independent evidence that the victim genuinely feared punishment, and that such fear was so great that the child would take the extraordinary step of fabricating sexual assault charges to avoid the punishment, we find that the probative value of the victim's past sexual conduct outweighs its prejudicial effect. Weber has met this heavy burden in the instant case.

fact that, at trial, Weber testified that he only slapped Daughter a few times and denied that any continued physical abuse had occurred. As such, the Commonwealth concludes that it would have been inconsistent to allow the defense to present evidence that Daughter was motived to fabricate the sexual abuse charges in order to avoid a beating by her father. We disagree.

Establishing a witness's motive to lie is essentially an examination of the witness's state of mind. Here, Weber contends that Daughter fabricated the allegations out of fear. Fear, however, is subjective. Thus, whether a history of physical abuse actually existed is an independent question from whether Daughter genuinely feared a beating. While evidence of a history of physical abuse would clearly lend itself to the conclusion that Daughter actually feared being beaten, absence of such evidence does necessarily mean that genuine fear did not exist. Weber presented direct evidence as to Daughter's subjective state of mind concerning her fear of being beaten by appellant. Not only did she demonstrate such fear in 1990 when she admitted to the police that she submitted a false report of kidnapping in order to avoid her father's anger with her poor grades, Daughter also admitted to two witnesses that she specifically feared being beaten by Weber once he learned of her pregnancy and planned abortion. As such, we cannot find that the direct evidence of Daughter's subjective fear was inconsistent with Weber's testimony that no history of abuse existed. Consequently, we find that the proffered evidence should have been properly admitted at trial.

The fact that Weber's proffered evidence should have been properly admitted at trial, however, does not serve to terminate our review of the present case. Although appellate counsel for the defendant characterizes this case as a violation of Weber's constitutional right to confront his accuser, a review of the record reveals that Judge Panella did allow defense counsel to question Daughter concerning her admissions to Michael Weber, Jr. and Michelle LeBar. Specifically, defense counsel questioned Daughter as follows:

Q. Now, at some time in September of 1993, you had an abortion; is that correct?

A. Yes, it is.

Q. And after you had that abortion, which was done in Philadelphia, correct—

A. Yes.

Q. —you called Mike Weber and Michelle—Mike Weber Junior, your brother, and his girlfriend about that; isn't that correct?

A. I called them when I found out I was pregnant.

Q. And, in fact, I think you called them, if I'm not mistaken, on or about September the 20th, right around your birthday; isn't that correct?

A. I found out on my birthday that I was pregnant.

Q. And you talked to them on the phone that night?

A. Yes.

Q. Didn't you tell them, Miss Weber, that please don't tell my parents, please don't especially tell my father that I'm pregnant, that I'm going to have an abortion because I know he'll beat me if you tell him?

A. Yes, I did.

N.T., 5/9/95 at 201–202.

■ In light of this questioning, we cannot find that Weber's right to confront was infringed upon. What is problematic, however, is the fact that after allowing the above cross-examination to occur, Judge Panella precluded Weber's defense counsel from 1) presenting the testimony of Michael Weber, Jr. and Michelle LeBar concerning Daughter's admissions, and 2) commenting on Daughter's fear of being beaten as a result of her pregnancy and planned abortion during summation.[9] These prohibitions constitute error by the trial court.

9. Judge Panella took these steps upon finding that such evidence would have been inconsistent with Weber's testimony that he had not physically abused Daughter. As noted above, however, we find that Weber's testimony was, in fact, consistent with Daughter's subjective fear of being beaten.

50

The error of refusing to allow Michael Weber, Jr. and Michelle LeBar to testify about their conversation with Daughter, however, is not fatal. While it was a mistake to preclude this testimony, nevertheless, Daughter, herself, admitted to the contents of the conversation. As such, the testimony of Michael, Jr. and his girlfriend would have been merely cumulative and we deem its prohibition harmless. *See Commonwealth v. Hradesky,* 170 Pa.Super. 24, 29, 84 A.2d 393, 396 (1951) ("Any error that may have resulted from the exclusion of defense testimony at one point was harmless as appellant was given full opportunity to make denials and explanations at another."); *Commonwealth v. Balles,* 163 Pa.Super. 467, 471–72, 62 A.2d 91, 93 (1948) ("under the circumstances we feel that no reversible error was committed insomuch as the answers sought to be elicited by the defendant from [the witness] did actually come from her elsewhere in the course of her examination or were testified to positively by the defendant."). *See also Commonwealth v. Neill,* 362 Pa. 507, 516, 67 A.2d 276, 280 (1949) (it was error to preclude certain public records from evidence, "but their partial exclusion worked no substantial damage to defendant because all the material portions of their contents were brought out in the testimony of defendant himself or of other witnesses.").

The fact that defense counsel was limited in his closing argument, however, does constitute a fatal error. Statements which have been properly placed into evidence can be "referred to, quoted, or emphasized by either counsel during closing arguments." *Commonwealth v. Stark,* 363 Pa.Super. 356, 373, 526 A.2d 383, 392 (1987), *alloc. denied,* 517 Pa. 622, 538 A.2d 876 (1988). Further, counsel may argue inferences which reasonably derive from evidence properly admitted at trial. *Commonwealth v. Lawson,* 519 Pa. 175, 180, 546 A.2d 589, 596 (1988).[10] Instantly, we have found that

10. We note that Pennsylvania courts have only adopted the above standards in cases where the prosecution's closing argument was in question. This fact is not surprising because, as noted by our brethren in Massachusetts,

[o]pinions discussing acceptability of particular jury arguments usually involve challenges to prosecutor's closing arguments. Because the

evidence that Daughter feared being beaten by Weber as a result of her pregnancy and planned abortion was properly admitted at trial. Consequently, defense counsel should have been allowed to comment upon this evidence and to draw for the jury the logical inference that Daughter fabricated her story in an attempt to avoid this specific beating. Moreover, the prejudicial effect of this omission cannot be overstated. "There can be no doubt that closing argument for the defense is a basic element of the adversary fact-finding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553, 45 L.Ed.2d 593, 598 (1975). As previously found by this Court,

> [i]t could very well be the case that a fact finder will have a definite opinion on a witness's credibility immediately after hearing the witness testify but change that opinion when, during oral argument, counsel points out something to the fact finder that causes him to change that opinion. It is often impossible to state with certainty the exact point when one forms an opinion on any matter.

*Commonwealth v. Lowery*, 276 Pa.Super. 569, 581, 419 A.2d 604, 610 (1980). Thus, we find that the trial court committed a prejudicial error in prohibiting defense counsel from commenting upon Daughter's fear of being beaten once Weber learned of her pregnancy and planned abortion. This error clearly deprived Weber of a fair trial, and, consequently, we must vacate Weber's judgment of sentence and remand this case for retrial.

Commonwealth may not appeal from any possible adverse consequences of a defendant's improper jury argument, the propriety of a defense counsel's jury argument usually arises only when a convicted defendant challenges some ruling or jury instruction by the trial judge concerning defense counsel's argument. *Commonwealth v. Murchison*, 418 Mass. 58, 59, 634 N.E.2d 561, 562 (1994).

In any event, we find that these standards apply equally to the closing arguments of both the defense and the prosecution. As stated by the Supreme Court of our land, "it should be accepted that both the prosecutor and defense counsel are subject to the same general limitations in the scope of their argument." *United States v. Young*, 470 U.S. 1, 8–10, 105 S.Ct. 1038, 1042–43, 84 L.Ed.2d 1, 9 (1985).

Judgment of sentence vacated, case remanded for retrial. Jurisdiction relinquished.

EAKIN, J., filed a dissenting opinion.

EAKIN, Judge, dissenting.

I respectfully dissent from the ruling of my colleagues, which reverses appellant's conviction and grants a new trial.

I agree completely that evidence of an abortion is necessarily evidence of prior sexual activity, so as to bring it within the scope of the Rape Shield Law. Abortion does not arise without sexual activity, and if the latter is inadmissible, to treat evidence of the former differently would defeat the law's intent. *Commonwealth v. Berkowitz*, 537 Pa. 143, 641 A.2d 1161 (1994). Thus, the evidence of abortion should have been excluded, unless it had probative value outweighing its inherent prejudice. *See, e.g., Commonwealth v. Black*, 337 Pa.Super. 548, 487 A.2d 396 (1985).

In this case, the defense posits a theory that the victim fabricated the charges, motivated by fear of being beaten by appellant should he learn she had an abortion. Evidence of such a motive to falsify would be probative. *Commonwealth v. Reed*, 435 Pa.Super. 36, 644 A.2d 1223 (1994). Therefore, to determine the admissibility of evidence of the abortion, the trial court must weigh the probative value of the otherwise excludable testimony against the prejudice toward the victim that admission would cause.

My colleagues determine that any prejudice was outweighed by the probative value, and that the evidence should have been admitted, thus finding error. I do not find that the trial court was in error in excluding the evidence, as I believe appellant himself directly negated the theory that made the abortion testimony potentially relevant in the first place.

This issue did not arise suddenly at trial. It was the subject of a pretrial proceeding and ruling, whereby the court stated it would consider the evidence of abortion only if there was independent evidence of the victim's fear that physical abuse would ensue. That is, the relevance of the abortion is nonexis-

tent unless the fear of a retaliatory beating is otherwise established. Without that fear, there is no probity in the proffered evidence.

The trial judge ruled that if this theory (fear of beating from her father) was not established by independent evidence, rather than merely alleging the theory, the manifestly prejudicial testimony of abortion would not be allowed. To rule otherwise would allow any self-serving theory from a defendant to bootstrap all sorts of slander into evidence without corroboration or any hint of trustworthiness of the prejudicial allegations.

Had appellant admitted thrashing his daughter over the years, his "theory" might hold water; the other evidence of bruising might be corroborative enough to allow admission of the evidence he sought to introduce. However, he denied such abuse at trial; appellant took the stand and personally repudiated any physical abuse that would cause his daughter to fear a beating. When he personally disavowed the factual basis of his theory, he took any wind of probative value out of the sails of admissibility.

The law clearly allows one to present multiple and inconsistent defenses, but the introduction of highly prejudicial and otherwise inadmissible evidence should not be countenanced when the defense theory of relevance is specifically refuted by the proponent himself. *See, e.g., Commonwealth v. Mayfield,* 401 Pa.Super. 560, 585 A.2d 1069 (1991) (while a defendant has no burden to prove claim of self-defense, he may not testify inconsistently with, or negate an element of, the defense and still avail himself of it).

As such, I would affirm the trial court's decision that appellant not only failed to make out the victim's fear of a beating, he negated its very existence under oath and nullified any probative value in the evidence of abortion. That this evidence came in at all through cross-examination of the victim is more than the defense was entitled to.

My colleagues find the court in error, but find that error to be harmless (a question I need not reach), as the evidence came in despite the ruling, under cross-examination of the

victim. They reverse because of the trial court's purported preclusion of closing argument on the issue. Appellant states his issue thusly;

> DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN DENYING DEFENDANT'S REQUEST TO INTRODUCE TESTIMONY CONCERNING A FABRICATION DEFENSE THROUGH A MISAPPLICATION OF THE RAPE SHIELD LAW?

This issue has not been raised before us.[1] Appellant has not heretofore complained of preclusion of closing argument, and if he wished us to consider that ruling, he should have raised it timely in his Statement of Matters Complained of on Appeal. Thus he has chosen not to appeal that issue, which is therefore waived. The Commonwealth has not been alerted to address the issue, nor has the trial court had the opportunity to provide its insight into this. As we have answered the issue raised, I would not endeavor to consider matters not complained of.

---

1. Even if properly before us, my resolution of the primary issue would make the question of closing argument moot, and my result would still be to affirm conviction.